**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

**WALID ACHOURI,**

      Plaintiff,

v.

**SUGAR FACTORY BRANDS LLC**
**d/b/a SUGAR FACTORY,**
**STEVEN DAVIDOVICI, and**
**BRANDON YENGLIN, and**
**REBECCA TORRES-WALLACE,**

      Defendants.

Case No. 2:26-cv-11520

**COMPLAINT and**
**JURY DEMAND**

---

1. This is a claim for religious discrimination, harassment, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act, 42 USC § 2000e *et seq* ("Title VII"), and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL §37.2101 *et seq*., stemming from Plaintiff's employment with Defendant Sugar Factory Brands LLC d/b/a/ Sugar Factory ("Defendant" or "Sugar Factory").

**PARTIES**

2. Plaintiff Walid Achouri (Plaintiff) is a Muslim man of the Arab race who resides and at all relevant times resided in Detroit, Michigan.

3. Defendant SUGAR FACTORY is a for-profit restaurant company that was, upon information and belief, originally organized under the laws of the State

1

of Nevada in or around 2008 and later converted into a Florida limited liability company in or around 2020. Sugar Factory maintains a continuous operation at its place of business in the Eastern District of Michigan, its restaurant located at 45 Monroe Street in Detroit, Michigan.

4. At the time of the events described in this Complaint, Defendant Steven Davidovici ("Davidovici") was, and upon information and belief presently is, the Co-director of Operations for Sugar Factory. He was therefore managerial-level personnel of Defendant Sugar Factory with authority to make, or substantially influence, the decision to hire, fire, discipline, promote, or demote Plaintiff from his position of employment. Upon information and belief, Davidovici resides in San Diego, California.

5. At the time of the events described in this Complaint, Defendant Brandon Yenglin ("Yenglin") was an executive chef visiting the Detroit Sugar Factory restaurant location. While there, Yenglin was a managerial-level employee of Sugar Factory with authority to make, or substantially influence, the decision to hire, fire, discipline, promote, or demote Plaintiff from his position of employment. Upon information and belief, Yenglin resides in Florida.

6. At the time of the events described in this Complaint, Defendant Rebecca Torres-Wallace ("Torres-Wallace") was, and upon information and belief

2

presently is, the human resources manager for Sugar Factory. She was a managerial-level employee of Sugar Factory with authority to make, or substantially influence, the decision to hire, fire, discipline, promote, or demote Plaintiff from his position of employment. Upon information and belief, Torres-Wallace resides in Nevada.

7. This claim stems from Defendants' actions towards Plaintiff during the course of his employment that occurred in Detroit, Michigan, which is within the jurisdictional bounds of the Eastern District of Michigan.

## JURISDICTION AND VENUE

8. The Court has *general in personem* jurisdiction over the Defendant Sugar Factory by reason of its permanent business presence within the Eastern District. The Court has *general in personem* jurisdiction over the individual Defendants by reason of their systematic and continuous exercise of business activities within same. In the alternative, the Court has *specific jurisdiction* over this dispute because the transaction or occurrences giving rise thereto occurred within, or resulted from Defendants' business activities within and directed towards, the Eastern District of Michigan.

9. The Court has subject matter jurisdiction over Plaintiff's claims stemming from federal law pursuant to 28 USC § 1331. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC § 1367.

10. Venue is proper in this forum pursuant to 28 USC § 1391(b)(2), and 42 USC § 2000e-5(f)(3).

## FACTUAL ALLEGATIONS

11. Plaintiff repeats and re-alleges the previous numbered paragraphs as if fully restated herein.

12. Plaintiff is an Arab man and life-long observant Muslim whose religious beliefs are sincerely held.

13. One vital way that Plaintiff practices his faith is by praying five times a day at certain, prescribed times, with a prayer specific to each time. To accomplish this obligation requires a clean, private place to pray for several minutes at the prescribed times without interruptions.

14. To Plaintiff's knowledge, he was the only Muslim employee at the Detroit Sugar Factory location, or at least the only one who prayed five times a day.

15. Plaintiff also practices his faith by observing the Holy Month of Ramadan through 30 days of fasting from sunrise to sunset without food or water, as well as other observations, including prayer, particularly at sundown, which Plaintiff describes as the holiest time of day. It is very important to Plaintiff's religious beliefs and practices to pray, show gratitude, and break fast at sundown during Ramadan with a meal called Iftar, which occurs at the time of the Maghrib prayer.

4

16. In 2025, Ramadan began on the evening of February 28 and ended on Eid al-Fitr, on or about the evening of Sunday, March 30, 2025.

17. To Plaintiff's knowledge, he was the only employee at the Detroit Sugar Factory who observed Ramadan by fasting.

18. On or around March 6 or 7, 2025, Plaintiff was working his shift at Sugar Factory. Because it was Ramadan, he had been fasting since before sunrise. At sundown around 6:30 p.m., it was time for him to break his fast and eat for the first time in nearly 14 hours. Plaintiff had brought some food with him to work so he could break his fast, which typically involves a small meal of dates and milk or water before a larger meal later.

19. When Plaintiff told a co-worker that he needed to take a short break of about 15 minutes to eat and pray, Defendant Brandon Yenglin, chef, overheard the conversation and reproached Plaintiff, saying that he was only allowed two meals per day and refused to allow Plaintiff to break his fast and observe Iftar.

20. Plaintiff reminded Defendant Yenglin that he hadn't eaten any meals that day and was at risk of fainting if he didn't break his fast. When he tried to quickly eat a couple dates and a few bites of bread, Yenglin yelled at Plaintiff in front of staff, using words to the effect of "I really don't care. I

5

have a business to run!" and made him return to the restaurant floor without eating.

21. Later in his shift, feeling dizzy, Plaintiff leaned against the wall while speaking to a server.  Yenglin gave him a dirty look and said words to the effect of, "Are you going to stand here and do nothing?"

22. At the time, the restaurant was not very busy. There were many empty tables and sufficient other managers and staff to take care of the patrons without impacts to customer service.

23. Yenglin's treatment of Plaintiff left Plaintiff humiliated and feeling disrespected. Some other employees commented on this discrimination.

24. Plaintiff emailed Defendants Davidovici and Torres-Wallace the same day to inform them that Yenglin had denied him a short break to eat after a day of fasting for Ramadan, and Plaintiff attached pictures of the dining room showing that there were many empty tables and other staff present.

25. Following Plaintiff's report of the incident to Davidovici and Torres-Wallace, the harassment, discrimination, and hostilities towards Plaintiff worsened.

26. Rather than taking action against Yenglin, the next day on March 8, 2025, Defendants Yenglin and Torres-Wallace issued a disciplinary writeup ("Employee Counseling Notice") to Plaintiff for absences from work that

6

occurred between a month and two weeks before, on February 8, 16, and 23. **Exhibit B.** The timing of this disciplinary action, occurring on the day after Plaintiff reported Yenglin's religious discrimination and refusal to accommodate his religious practices, strongly suggests that it was retaliatory in nature and that the absences from weeks before were merely a pretext. Had these Defendants truly been interested in disciplining Plaintiff for calling off of work on February 8, 16, and 23, they would have done so weeks before.

27. On March 19, 2025, Defendant Torres-Wallace again issued a disciplinary writeup to Plaintiff for reporting the harassment and discrimination he was experiencing at work.  The writeup alleged a Date of Incident of "Feb. 2025 – March 15, 2025, which timeframe included his March 7 report of Yenglin refusing to accommodate his need to observe Iftar during Ramadan. Torres-Wallace wrote the following description of the reason for the discipline: "Walid has reportedly made accusations of discrimination and/or harassment from coworkers (Management included) with unsupported evidence which is in conflict with the Company's policies regarding negative, offensive, derogatory or other comments directed to the Company, Management, Directors, employees and the like.  These accusations may be considered slanderous and/or libelous. These negative comments add consideration to

creating a hostile work environment which may also include harassment/intimidation/bullying." [sic]. The description noted that Plaintiff had been supporting his reports with photographic or video evidence, which Torres-Wallace said was prohibited.  This March 19, 2025 Employee Counseling Notice is attached as **Exhibit C.**

28. Defendant Torres-Wallace punished Plaintiff for reporting illegal discrimination and harassment with a one-day unpaid suspension.  **Exhibit C.**

29. Defendants did not provide Plaintiff with a place to pray his daily prayers, as his religious observations required,

30. Plaintiff was directed to pray in the liquor closet. But alcohol is haram (forbidden) to observant Muslims like Plaintiff.  Being surrounded with a forbidden substance while praying in the liquor closet violates Plaintiff's sincerely held religious beliefs.

31. So Plaintiff was told to pray in the manager's office.  But the managers office was often busy with other managers conducting phone calls, taking breaks, talking, and going in and out of the office.  When the office was in use during one of his times for prayer, he was instructed that he'd have to "pray later."  This violates Plaintiff's sincerely held religious beliefs, as the holiest and most appropriate time to pray is at the prescribed time for that

specific prayer. Having to pray the day's missed prayers hours later when he arrived home violated his religious observances and left Plaintiff feeling more distant from Allah – the opposite of the intent in praying as prescribed.

32. When he was able to pray in the office, he was often interrupted by other managers opening the door to the office and cussing, as in, "Oh shit, he's praying!"

33. The staff office was not a suitable place to pray for other reasons. For one, the floor was dirty because people wore their shoes in there and tracked in grease and crumbs from the kitchen, including from pork products sold at the restaurant. Muslims need a clean place to pray and remove their shoes when praying. Rather than pray on a dirty floor, Plaintiff would mop and sanitize the floor to remove the grease and crumbs. But other managers would walk in during his prayers wearing their shoes, even when they know that he had specifically cleaned it for prayer.

34. Plaintiff had to fashion a prayer mat from cardboard from boxes. He would then store the cardboard mat in the office. Often, other managers who knew that he used the mat for prayer would throw it away.

35. Plaintiff suffered verbal insults and harassment from staff and other managers based on his religion. He was called disparagingly called a "Habibi," which is an insult when used in a condescending manner by a non-

9

Arab or non-Muslim.  He was also called an "A-rab" with the emphasis on the first syllable and the word altered to rhyme with "tab" in the context of a manager saying that, because as a Muslim he had access to family support, "he got that A-rab money."

36. As the hostilities towards him escalated for reporting discrimination and harassment, he began to experience physical intimidation, including being grabbed by the shoulders by an angry bartender Tony Readus in front of guests, and on another occasion, having manager Kyle Murphy stand in his way and call him a "bitch" in front of the guests.

37. Plaintiff suffered a severe injury to his hand while at work when a door to the Sugar Factory slammed shut on his finger when he was trying to close it during an extremely windy day.  Plaintiff promptly reported the injury, which required a trip to the hospital in the ambulance for stitches and other medical care.  But management did not report his injury to Workers Compensation, leaving him with over $10,000 in medical bills.  Plaintiff believes that this failure to report his workplace injury was another form of retaliation against him for reporting the religious discrimination and harassment.

38. Following his resignation due to the ongoing failure to accommodate and escalating harassment and hostile work environment, Plaintiff filed with the

Michigan Unemployment Insurance Agency (UIA) for unemployment benefits.

39. While his claim was initially denied because he resigned his employment, Plaintiff appealed and the UIA determined that he was constructively discharged.

40. On or about October 23, 2025, Plaintiff initiated a charge of discrimination with the Michigan Department of Civil Right and the U.S. Equal Employment Opportunity Commission (EEOC) Detroit Field Office. He alleged discrimination based upon his religion, Islam, including failure to accommodate and harassment/hostile environment. The EEOC assigned the matter Charge Number 23A-2026-00425 (FEPA Number: 661022).

41. Based on a review of the EEOC file, it does not appear that Sugar Factory responded substantively.

42. The EEOC notified Plaintiff that it made no determination but would not proceed further with its investigation, and it issued Plaintiff a Notice of Right to Sue on February 5, 2026, attached here as **Exhibit A**.

43. This suit timely follows.

**COUNT 1 – RELIGIOUS DISCRIMINATION**
*In Violation of Title VII*
**As Against Defendant Sugar Factory**

11

44. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

45. Title VII prohibits an employer from discriminating against one of its employees by reason of their religion. Discrimination based upon religion may include, in certain circumstances, failure to provide reasonable accommodations for a given employee's religious practices during work hours. Discrimination based upon religion may also include harassing an employee for religious observations and practices while at work.

46. Defendant Sugar Factory is an employer, within the meaning of the Title VII statute.

47. Plaintiff was, until  his termination, an employee of Sugar Factory within the meaning of Title VII. Plaintiff, an observant Muslim, was also a member of a class of individuals under Title VII based upon his religion.

48. Plaintiff suffered unlawful at-work harassment, based upon his religion, when Defendants questioned him and harassed him about observing prayer times.

49. Plaintiff suffered unlawful discrimination based upon his religion when, instead of allowing him the accommodation of prayer times, a place to pray, and the chance to break fast and observe Iftar during Ramadan, Defendant harassed and intimidated him for observing same.

12

50. Defendant was well aware of the unlawful, religious-based harassment to which Plaintiff was subjected. Plaintiff complained to his managers about same, both verbally and in writing.

51. Defendant, nevertheless, took no action to protect Plaintiff from the ongoing harassment.

52. Instead, Defendant punished Plaintiff with disciplinary actions, including an unpaid suspension.

53. Plaintiff has suffered damages including: a. Lost pay from the disciplinary suspension and loss of his position due to constructive discharge, b. Emotional pain and distress resulting from the mistreatment described herein, c. Attorney's fees and court costs in opposing discrimination.

54. Plaintiff is also entitled to an award of statutory damages by reason of Defendants' willful violation of Title VII described herein.

55. Plaintiff is also entitled to an award of punitive damages, sufficient to deter Defendant from future similar unlawful conduct.

## COUNT 2 – RELIGIOUS DISCRIMINATION
*Violation of Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq*
**As Against All Defendants**

56. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

57. Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA") provides, in pertinent part, that "an employer shall not … [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … religion . . ." MCL 37.2202. The ELCRA, unlike its federal counterparts, allows for suit against discriminating managers in their capacity as individuals. *Elezovic v. Ford Motor Company*, 472 Mich. 408 (2005).

58. Defendant Sugar Factory is, and at all times comprised in this Complaint was, an employer as that term is used in the ELCRA.

59. Defendant Davidovici, as a managerial level employee with Defendant, was an "employer" as defined by the ELCRA.

60. Defendant Yenglin, as a managerial level employee with Defendant, was an "employer" as defined by the ELCRA.

61. Defendant Torres-Wallace, as a managerial level employee with Defendant, was an "employer" as defined by the ELCRA.

62. Plaintiff suffered unlawful at-work harassment based upon his religion when Defendants refused to accommodate Plaintiff's religious practices and beliefs and retaliated against him for reporting harassment and

14

discrimination. The Individual Defendants participated in, approved, ratified, and retaliated against Plaintiff for same.

63. Plaintiff suffered unlawful discrimination based upon his religion when, instead of accommodating his prayer times, Defendants harassed and intimidated him for observing same. Individual Defendants participated in, or at least approved and ratified, same.

64. Defendants were well aware of the unlawful, religious-based harassment to which Plaintiff was subjected. Plaintiff complained to his managers about same, both verbally and in writing.

65. Defendants, nevertheless, took no action to protect Plaintiff from the ongoing harassment.

66. Instead, Defendants escalated the discrimination, harassment, and hostile work environment and/or allowed it to escalate when they had a duty to stop it.

67. Plaintiff has suffered damages including: a. Lost pay and benefits by reason of the unpaid punitive suspension and constructive discharge from his position and, b. Emotional pain and distress resulting from the mistreatment described herein, c. Attorney's fees and court costs in opposing discrimination.

68. Plaintiff is also entitled to an award of exemplary damages, in compensation for the humiliation, shock, and outrage that he has endured as a result of Defendants' willful violation of his rights.

### COUNT 3 –RETALIATION
### *In Violation of Title VII*
### As Against Defendant Sugar Factory

69. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

70. Title VII prohibits discrimination by an employer against any of its employees or applicants for employment because such individual has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under Title VII.

71. Plaintiff engaged in activity protected by the Title VII when he:

a. Complained to Defendant Davidovici and Torres about the harassment he had suffered related to his daily prayer obligations and observation of Ramadan. b. Reported the discriminatory comments, harassment, and physical intimidation he experienced based on his religion.

72. The Defendant retaliated against Plaintiff for the protected conduct above by suspending him from work without pay, writing him up for discipline, and intensifying the harassment and discrimination and intimidation and/or

allowed or encouraged same to intensify such that he was constructively discharged.

73. Plaintiff has suffered damages as a result of the Defendants' violation of his rights including: a. Lost pay, b. Emotional pain and distress, c. Attorney's fees in opposing said violations.

74. Plaintiff is entitled to statutory damages under Title VII by reason of Defendant's retaliation.

75. Plaintiff is also entitled to an award of punitive damages in an amount sufficient to deter Defendants from future similar unlawful acts.

## COUNT 4 –RETALIATION
### *In Violation of Michigan's Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq*
### As Against All Defendants

76. Plaintiff repeats and re-alleges the factual statements and legal conclusions contained in the previous numbered paragraphs as if fully restated herein.

77. Michigan's ELCRA prohibits an employer from retaliating or otherwise discriminating against an employee who opposes a violation of the Act, or participates in an investigation into violation of the same. As noted herein, and unlike its federal counterpart, the ELCRA allows individual liability against discriminating managers.

78. Plaintiff engaged in activity protected by the ELCRA when he complained to Defendants about the harassment and discrimination he had suffered related to his daily prayer obligations.

79. The Defendant retaliated against Plaintiff for the protected conduct above by terminating his employment in response to same.

80. Plaintiff has suffered damages as a result of the Defendants' violation of his rights including: a. Lost pay, b. Emotional pain and distress, c. Attorney's fees in opposing said violations.

81. Plaintiff is entitled to exemplary damages to compensate himfor the humiliation, outrage, and distress that he has suffered by reason of Defendants' willful violation of his rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief from this Honorable Court:

A. ECONOMIC DAMAGES including, but not necessarily limited to, lost front and back pay and benefits from the paid position he lost and unpaid suspension;

B. COMPENSATORY DAMAGES resulting from the emotional pain and distress he has suffered as a result of Defendants' unlawful conduct;

C. STATUTORY DAMAGES under Title VII;

18

D. EXEMPLARY DAMAGES pursuant to Michigan Common Law;

E. Such other COMPENSATORY damages as may be appropriate to compensate Plaintiff for Defendant's unlawful conduct;

F. PUNITIVE damages, in whatever amount the Court should deem appropriate, sufficient to deter Defendants from future such conduct;

G. ATTORNEY'S FEES, in an amount determined reasonable by the Court, so wrongfully incurred in order to remedy the violation of his rights described herein, pursuant to the various statutes identified herein;

H. Pre and post judgment interest at the appropriate statutory rate, and

I. Such other relief as this Court may deem just and appropriate in law or in equity.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Amy Marino*
Amy Marino
Gregory, Moore, Brooks, Clark & Helton, P.C.
28 W. Adams Avenue, Suite 300
Detroit, MI  48226
(313) 964-5600 main office
(313) 964-4211 direct
(313) 964-2125 fax
amy@unionlaw.net

19